MICHIGAN UP & OUT OF POVERTY NOW COALITION v STATE
OF MICHIGAN

Docket No. 150741. Submitted November 16, 1994, at Lansing. De-
cided April 21, 1995, at 10:50 A.M.

The Michigan Up & Out of Poverty Now Coalition brought an
action in the Ingham Circuit Court against the State of Michi-
gan, alleging that the revised procedures for the use of the
public areas of the Michigan State Capitol grounds approved by
the Michigan Capitol Committee on March 25, 1992, prevented
it from continuing its tent-city protest on the Michigan State
Capitol grounds in violation of its right to free speech under
the state and federal constitutions. The court, Lawrence M.
Glazer, J., dismissed the case and dissolved a temporary re-
straining order that had been issued, finding that the prohibi-
tions regarding overnight camping or sleeping on the grounds
were constitutional and that the contested committee proce-
dures were valid time, place, and manner restrictions on pro-
tected expressive activity. The plaintiff appealed and sought an
emergency stay of proceedings. The Court of Appeals, DOCTO-
ROFF, P.J., and CAVANAGH and MARILYN KELLY, JJ., denied the
motion for a stay of proceedings in an order dated April 9,
1992.

The Court of Appeals held:

1. The plaintiff did not demonstrate the existence of excep-
tional circumstances that would mandate review by the Court
of Appeals of the plaintiff's constitutional arguments presented
for the first time on appeal.

2. Because § IV(D) of the revised procedures is not a licensing
law that grants overly broad discretion to the Capitol Commit-
tee, it is not subject to facial attack by the plaintiff.

3. The state may impose reasonable restrictions on the time,
place, and manner of speech in a traditional public forum
provided that the restrictions are justified without reference to
the content of the regulated speech, they are narrowly tailored
to serve a significant governmental interest, and they leave

REFERENCES
Am Jur 2d, Constitutional Law §§ 460-463, 497, 506-521.
See ALR Index under Freedom of Speech and Press.

open ample alternative channels for communication. The state must demonstrate that the regulation is necessary to further a compelling governmental interest only where the regulation restricts speech on the basis of its content. The contested procedures, §§ IV(A),(D),(G), and (J), do not regulate speech on the basis of content and are valid time, place, and manner restrictions on protected free speech.

Affirmed.

1. CONSTITUTIONAL LAW — FREE SPEECH — FACIAL CHALLENGES.

Facial challenges to legislation generally are disfavored; in the context of free speech, however, an overbroad regulation of expressive activity may be subject to facial attack, even where its application in the case under consideration would not violate the constitution.

2. CONSTITUTIONAL LAW — FREE SPEECH — FACIAL CHALLENGES.

Facial challenges based on the overbroad regulation of expressive activity are recognized where a law or ordinance sweeps too broadly, covering a substantial amount of protected free speech, and where every application of a law or ordinance creates an unreasonable risk of censorship.

3. CONSTITUTIONAL LAW — FREE SPEECH — PUBLIC FORUMS — REASONABLE RESTRICTIONS.

The state may impose reasonable restrictions on the time, place, and manner of speech in a traditional public forum provided that the restrictions are justified without reference to the content of the regulated speech, they are narrowly tailored to serve a significant governmental interest, and they leave open ample alternative channels for communications; the state must demonstrate that a regulation is necessary to further a compelling governmental interest only where it restricts speech on the basis of its content.

4. CONSTITUTIONAL LAW — FREE SPEECH — STATE CAPITOL — PROCEDURES FOR USE.

Sections IV(A),(D),(G), and (J) of the procedures for the use of the public areas of the Michigan State Capitol approved by the Michigan Capitol Committee on March 25, 1992, do not regulate speech on the basis of content and are valid time, place and manner restrictions on protected free speech.

ACLU Fund of Michigan (by *Paul J. Denenfeld* and *Dorean Koenig*) (National Lawyers Guild/ Maurice and Jane Sugar Law Center for Economic

and Social Justice by *Kary L. Moss*, Executive Director, of Counsel), for the plaintiff.

*Frank J. Kelley*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Deborah A. Devine* and *Todd H. Cohan*, Assistant Attorneys General, for the defendant.

Before: WEAVER, P.J., and CORRIGAN and C. D. CORWIN,* JJ.

CORRIGAN, J. Plaintiff Michigan Up & Out of Poverty Now Coalition appeals as of right an Ingham Circuit Court order denying it injunctive relief. Plaintiff challenged the validity of several sections of the Michigan Capitol Committee Procedures for the Use of the Public Areas of the Michigan State Capitol[1] as prohibiting it, in violation of the First Amendment of the United States Constitution and Const 1963, art 1, § 5, from continuing its tent-city protest on the State Capitol grounds. The circuit court ruled that various questioned committee procedures were valid time, place, and manner restrictions on protected expressive activity. We affirm.

Plaintiff presents fifteen issues on appeal, attacking thirteen sections of the revised procedures. We decline to rule on several issues that were not presented in the circuit court and address only those questions that were explicitly raised and evaluated in the circuit court.

### I. UNDERLYING FACTS AND PROCEDURAL HISTORY

In December 1991, plaintiff sought and received a series of permits to erect a "tent city" on the Michigan State Capitol grounds in its quest to dramatize the plight of the homeless. The permits

---

* Circuit judge, sitting on the Court of Appeals by assignment.

[1] See Appendix, *infra.*

were issued by the Michigan Capitol Committee,[2] pursuant to committee rules then in effect for the use of the Capitol building and grounds. Those permits allowed plaintiff to erect tents on the Capitol grounds from December 5 to December 14, 1991. Although plaintiff's last permit expired on December 14, the tents remained on the Capitol grounds until December 20. Three days later, plaintiff received a permit and held a rally on the Capitol lawn between noon and 4:00 P.M. Although the permit merely permitted plaintiff to hold the rally, the executive director of the Capitol Committee allowed plaintiff to keep in place the tent it had erected in conjunction with the demonstration until the permit expired. At 4:00 P.M., Capitol security removed the tent. The same day, plaintiff requested another permit to erect a tent and to hold a prayer vigil on the Capitol grounds the following day. The executive director denied the request because no further permits could be issued without the approval of the full committee.

On an emergency basis, plaintiff obtained an ex parte temporary restraining order, preventing Capitol security from "interfering in any way with plaintiff's placement of not more than six tents on the State Capitol grounds." Plaintiff thereafter filed a complaint, requesting an order to show cause and a preliminary injunction. Before any formal hearings were held, the parties agreed to extend the temporary restraining order, pending review of the committee rules governing the use of the public areas of the State Capitol.

---

[2] The Michigan Capitol Committee is a statutorily created legislative/executive committee charged with developing written procedures for the management and operation of the Capitol building and grounds. MCL 4.1701 et seq.; MSA 2.138(701) et seq. Pursuant to MCL 4.1701(1); MSA 2.138(701)(1), the Capitol Committee is composed of twelve members: four from the state House of Representatives, four from the state Senate, and four individuals appointed by the Governor.

At the direction of the circuit court, plaintiff's lead counsel fully participated in the review process by attending meetings and supplying written memoranda and comments for the committee's consideration in redrafting the rules. After a 2½-month period of review and comment, during which approximately twenty drafts of revised procedures were generated, on March 25, 1992, the committee finally approved an amended version of procedures governing the Capitol building and grounds. In its newly revised procedures, the committee succeeded in deleting all waiver requirements, all insurance requirements, all permit requirements, and all references to religious practices. Indeed, plaintiff's lead counsel wrote that the revised procedures had "succeeded in many respects."

The day after the committee approved the revised procedures, plaintiff sought to enjoin enforcement of the procedures, alleging that §§ II(M)(5) and IV(A), (D), and (G)[3] of the new committee procedures unconstitutionally prohibited its tent-city vigil on the Capitol lawn. In a supplemental brief, plaintiff asserted that § IV(J) violated its right to erect symbolic tents on the Capitol grounds and presented a facial challenge to § IV(D). At a hearing in the circuit court, plaintiff seemed principally to object to the new restrictions on overnight camping on the Capitol lawn and on the erection of structures greater than three feet by three feet by three feet, which would preclude habitable structures, including tents. The circuit court observed that prohibitions against overnight camping or sleeping on the Capitol grounds were clearly constitutional, citing *Clark v Community for Creative Non-Violence,* 468 US 288; 104 S Ct 3065; 82 L Ed 2d 221 (1984). The circuit court

---

[3] See Appendix, *infra.*

thereafter held that the contested committee procedures were valid time, place, and manner restrictions on protected expressive activity under the Michigan and federal constitutions, dissolved the temporary restraining order effective April 3, 1992, and dismissed the case.

Plaintiff appealed and also sought an emergency stay of proceedings. This Court denied plaintiff's motion for a stay of proceedings. The committee procedures thereafter became final and effective pursuant to MCL 4.1702(1); MSA 2.138(702)(1).

## II. ISSUE PRESERVATION

On appeal, plaintiff challenges an array of committee procedures that were not passed on in the circuit court. For the first time on appeal, plaintiff mounts challenges to §§ II(A), (D), (E), and (P); III(H) and (J); IV(E) and (F); and V(D).[4] Plaintiff also argues for the first time on appeal that the existence of the Capitol Committee violates the Separation of Powers Doctrine, Const 1963, art 3, § 2. Finally, plaintiff contends that the court improperly denied it an evidentiary hearing, although it neither sought an evidentiary hearing nor objected to the entry of a final order by the circuit court.

Issues raised for the first time on appeal, even those relating to constitutional claims, are not ordinarily subject to appellate review. *Booth Newspapers, Inc v Univ of Michigan Bd of Regents,* 444 Mich 211, 234; 507 NW2d 422 (1993), citing *In re Forfeiture of Certain Personal Property,* 441 Mich 77, 84; 490 NW2d 322 (1992), and *Butcher v Dep't of Treasury,* 425 Mich 262, 276; 389 NW2d 412 (1986); see, also, *FW/PBS, Inc v Dallas,* 493 US 215, 237; 110 S Ct 596; 107 L Ed 2d 603 (1990).

[4] See Appendix, *infra.*

Because plaintiff has not demonstrated exceptional circumstances, we decline to reach the host of unpreserved constitutional claims that plaintiff has presented. We are fully cognizant that political speech in this state's Capitol lies at the heart of the free speech guarantees of the state and federal constitutions. We are also mindful that this Court functions as a court of review that is principally charged with the duty of correcting errors. We see no exigent circumstances in this case that would mandate review of constitutional arguments presented for the first time on appeal. *Booth, supra.*

### III. STANDARDS FOR INTERPRETATION OF FREE SPEECH CLAIMS

We now turn to those issues that plaintiff has properly preserved. Plaintiff challenges various committee procedures both facially and as applied, contending that those procedures violate its rights to free speech under the state and federal constitutions. Const 1963, art 1, § 5 provides:

> Every person may freely speak, write, express and publish his views on all subjects, being responsible for the abuse of such right; and no law shall be enacted to restrain or abridge the liberty of speech or of the press.

The relevant text of the First Amendment of the federal constitution states "Congress shall make no law . . . abridging the freedom of speech."

Our Supreme Court has interpreted the rights to free speech under the Michigan and federal constitutions, US Const, Am I, as coterminous. *Woodland v Michigan Citizens Lobby,* 423 Mich 188,

202; 378 NW2d 337 (1985). Plaintiff has identified no compelling reason for interpreting the Michigan Constitution more broadly than the federal constitution, *Sitz v Dep't of State Police,* 443 Mich 744, 763; 506 NW2d 209 (1993). We thus review plaintiff's challenges to the new procedures in accordance with federal authority construing the First Amendment.

### IV. STANDING: FACIAL CHALLENGES

Plaintiff facially challenges the new Capitol Committee procedures on grounds that § IV(D) grants the committee overly broad discretion to deny the public permission to picket or distribute leaflets on the Capitol grounds. Section IV(D) provides:

> Picketing and the distribution of literature shall not impede or interfere with State business or public access to and use of the Capitol. *In order to inform individuals and organizations of the procedures for the use of public areas of the Capitol and grounds, it is recommended, but not required, that individuals and organizations desiring to distribute literature on the Capitol grounds advise the Capitol Facility Manager of the date and time of this activity.* In order to assure the reasonable conduct of public business, unobstructed access to the Capitol for its occupants and the public, and to maintain the Capitol grounds, the Executive Committee (composed of the Chair and Vice-Chairs) of the Michigan Capitol Committee has been delegated the authority to designate specific areas of the grounds for picketing and the distribution of literature, which shall apply equally to all such activities. Individuals distributing literature shall remove all discarded items from the grounds at the conclusion of their activity. [Emphasis added.]

Plaintiff's facial attack on the committee rules cannot succeed.[5]

Generally, facial challenges to legislation are disfavored. In the context of free speech, however, an overbroad regulation of expressive activity may be subject to facial attack, even where its application in the case under consideration would be constitutionally unobjectionable. *Forsyth Co, Georgia v Nationalist Movement,* 505 US 123; 112 S Ct 2395, 2400-2401; 120 L Ed 2d 101 (1992); *City Council of Los Angeles v Taxpayers for Vincent,* 466 US 789, 798-799; 104 S Ct 2118; 80 L Ed 2d 772 (1984). Two forms of overbreadth challenges have been recognized: where a law or ordinance sweeps too broadly, covering a substantial amount of protected free speech, and where every application of a law or ordinance creates an unreasonable risk of censorship. *Forsyth Co, supra* at 129-130. For example, when a licensing law allegedly vests "unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license." *Lakewood v Plain Dealer Publishing Co,* 486 US 750, 755-756; 108 S Ct 2138; 100 L Ed 2d 771 (1988); *Freedman v Maryland,* 380 US 51, 56; 85 S Ct 734; 13 L Ed 2d 649 (1965); *Thornhill v Alabama,* 310 US 88, 97; 60 S Ct 736; 84 L Ed 1093 (1940). In *Lakewood,* the Supreme Court struck down a municipal ordinance granting the mayor unbridled discretion to deny permit applications and unbounded authority to condition

[5] Plaintiff has not shown a live controversy involving the actual or threatened application of § IV(D). Plaintiff has not sought to engage in picketing or distributing leaflets and been denied access to the Capitol grounds at any time. Plaintiff's assertion that it may seek to picket or distribute leaflets sometime in the future does not confer standing. *Renne v Geary,* 501 US 312; 111 S Ct 2331; 115 L Ed 2d 288 (1991). Additionally, plaintiff's claim is not ripe. *Id.*

permits on any terms he deemed necessary and reasonable. *Id.* at 772.

This exception to the usual standing requirements arises because a licensing law that places "unbridled discretion in the hands of a government official or agency constitutes a prior restraint and may result in censorship." *Id.* at 757, citing *Shuttlesworth v Birmingham,* 394 US 147; 89 S Ct 935; 22 L Ed 2d 162 (1969); *Cox v Louisiana,* 379 US 536; 85 S Ct 453; 13 L Ed 2d 471 (1965). The dangers of censorship and abridgment of free speech exist when a permit process " 'involves appraisal of facts, the exercise of judgment, and the formation of an opinion' " by the licensing authority. *Forsyth Co, supra* at 131, quoting *Cantwell v Connecticut,* 310 US 296, 305; 60 S Ct 900; 84 L Ed 1213 (1940), and citing *Southeastern Promotions, Ltd v Conrad,* 420 US 546, 553; 95 S Ct 1239; 43 L Ed 2d 448 (1975). To mitigate the risk of censorship, " 'a law subjecting the exercise of [free speech] to the prior restraint of a license' must contain 'narrow, objective, and definite standards to guide the licensing authority.' " *Forsyth Co, supra* at 131, quoting *Shuttlesworth, supra* at 150-151.

Plaintiff has not shown that § IV(D) creates a censorship risk and is therefore subject to facial attack. Plaintiff argues that § IV(D) is overly broad because the committee has unbridled discretion to deny permission to anyone wishing to picket or distribute literature on the Capitol grounds. Plaintiff asserts that the recommendation that individuals notify the facility manager of their intent to distribute literature or picket amounts to a license or permit requirement.

We think that plaintiff has misread the provision. Section IV(D) does not impose either a licensing requirement or a prior restraint on speech.

The revised procedures do not require anyone to obtain permission to picket or distribute leaflets on the Capitol grounds. The facility manager has no discretion to deny individuals the right to picket or distribute leaflets. Indeed, § IV(D) states that "to inform individuals and organizations of the procedures for the use of public areas of the Capitol and grounds, *it is recommended, but not required,* that individuals" advise the facility manager of their intent to distribute literature. (Emphasis added.) The rule is couched in terms of a recommendation. It contains no hint of a penalty for noncompliance. Neither the facility manager nor the committee can prevent speech from taking place. Because § IV(D) is not a licensing law that grants overly broad discretion to the committee, it is not subject to facial attack.[6]

### V. RESTRICTIONS ON SPEECH IN A PUBLIC FORUM

Plaintiff also challenges the Capitol Committee's regulation of expressive activity on the Capitol grounds. The Capitol grounds constitute a traditional public forum, where the right to free speech is closely guarded. Quintessential public fora include "those places 'which by long tradition or by government fiat have been devoted to assembly and debate,' such as parks, streets, and sidewalks." *Burson v Freeman,* 504 US 191; 112 S Ct 1846, 1850; 119 L Ed 2d 5 (1992) (plurality opinion), citing *Perry Ed Ass'n v Perry Local Educators' Ass'n,* 460 US 37, 45; 103 S Ct 948; 74 L Ed 2d 794

---

[6] Plaintiff's claim that the executive director of the Capitol Committee retains unfettered discretion concerning the size, number, and placement of for-shelter, as opposed to non-shelter, structures may be summarily dismissed. For-shelter structures include only those structures that are used to shield an exhibit or event from the elements. Because such structures do not constitute expressive activity, they do not implicate Const, 1963, art 1, § 5, or the First Amendment, US Const, Am I.

(1983). Plaintiff contends that *any* restrictions on free expression in a public forum must pass muster under a strict scrutiny test, a shift in this Court from its posture below. In the circuit court, plaintiff conceded defendant's regulation of speech need only satisfy a time, place, and manner analysis. Plaintiff now claims that the government must demonstrate a compelling state interest in order that its regulations pass constitutional muster. We disagree.

Even in a traditional public forum, the state may impose reasonable restrictions on the time, place, and manner of protected speech. *Ward v Rock Against Racism,* 491 US 781, 791; 109 S Ct 2746; 105 L Ed 2d 661 (1989). Restrictions of this kind are valid provided that they " 'are justified without reference to the content of the regulated speech, that they are narrowly tailored to serve a significant governmental interest, and that they leave open ample alternative channels for communication.' " *Id.,* quoting *Clark, supra* at 293; *United States v Grace,* 461 US 171, 177; 103 S Ct 1702; 75 L Ed 2d 736 (1983); *Perry, supra.* Only where a regulation restricts speech on the basis of its content must the state demonstrate that the regulation is necessary to further a compelling governmental interest. *Ward, supra; Perry, supra.* Because plaintiff does not allege that the committee procedures regulate speech on the basis of content, we consider whether they qualify as valid time, place, and manner restrictions.

Section IV(D) does not destroy the public-forum status of the Capitol grounds. Section IV(D) is a valid time, place, and manner restriction on protected free speech. First, § IV(D) is content-neutral; it applies equally to all citizens " 'without reference to the content of the regulated speech,' " *Madsen v Women's Health Center, Inc,* 512 US —;

114 S Ct 2516, 2523; 129 L Ed 2d 593 (1994), quoting *Ward, supra* at 791. Second, the state has a significant interest in providing access, free from obstruction, to and from the Capitol for its occupants and for the public in general. *Heffron v Int'l Society for Krishna Consciousness, Inc,* 452 US 640; 101 S Ct 2559; 69 L Ed 2d 298 (1981).

*Heffron* upheld a local rule that designated certain areas at a state fair for literature distribution. *Id.;* see, also, *Cameron v Johnson,* 390 US 611; 88 S Ct 1335; 20 L Ed 2d 182 (1968) (upholding statute that prohibited picketing that obstructed or unreasonably interfered with ingress and egress to or from public buildings, including courthouses). A restriction on speech is narrowly tailored " 'so long as the . . . regulation promotes a substantial government interest that would be achieved less effectively absent the regulation.' " *Ward, supra* at 799, quoting *United States v Albertini,* 472 US 675, 689; 105 S Ct 2897; 86 L Ed 2d 536 (1985).

Section IV(D) limits the committee's discretion to designate areas for picketing or distributing leaflets only to further the purpose of allowing safe ingress and egress to and from the Capitol building. Because § IV(D) leaves all other areas of the Capitol grounds available for picketing and literature distribution, it is narrowly tailored and leaves open ample alternative channels of communication. *Heffron, supra.*[7] Accordingly, § IV(D) is a permissible regulation.

---

[7] Plaintiff also argues that § IV(D) unconstitutionally applies to the sidewalks abutting the Capitol grounds. However, defendant stipulated in its brief on appeal that the Capitol Committee procedures do not apply to the sidewalks. Moreover, nothing in the rules' definition of the grounds suggests that it includes the sidewalks. In any event, the rule could validly apply to the surrounding sidewalks for the same reasons that it validly applies to the Capitol grounds. The sidewalks command no greater status as a traditional public forum than do the Capitol grounds. *United States v Grace,* 461 US 171, 177; 103 S Ct 1702; 75 L Ed 2d 736 (1983).

Plaintiff next contends that §§ IV(A) and (G) unconstitutionally limit the duration of a protest that may be held on the Capitol lawn. We disagree. Sections IV(A) and (G) provide:

A. In order to maintain the security, safety and aesthetic appearance of the Capitol and Capitol grounds, and to provide for regular maintenance, improvements or alterations, scheduled events or exhibits on the Capitol grounds shall occur between the hours of 8:00 A.M. to 11:00 P.M. on a daily basis, and shall at no time block any entrance or exit of the building, or impede free access to the building by its occupants or the public. When either house of the legislature or legislative committee is in session prior to 8:00 A.M. or after 11:00 P.M., the grounds shall be open 30 minutes before commencement of the session and closed 30 minutes after adjournment of the Senate, House of Representatives, or legislative committee.

*   *   *

G. Equipment or structures of any kind that are placed on the Capitol grounds in connection with an event or exhibit shall be entirely removed at the conclusion of the event or exhibit, or no later than the time set for closing of the grounds as set forth in Section IV(A).

Sections IV(A) and (G) are valid time, place, and manner restrictions on the time an individual or group may hold an event[8] or exhibit[9] on the Capitol grounds. The time limitations apply to all

---

[8] Section I(B) of the procedures defines an "event" as follows:

Any performance, ceremony, presentation, meeting, rally or reception held in the public areas of the Capitol. A rally is defined as a gathering of people for the purpose of actively promoting a cause.

[9] Section I(A) of the procedures defines an "exhibit" as follows:

individuals or groups desiring to hold an event or exhibit, regardless of the message to be conveyed. The rule is therefore content-neutral. *Madsen, supra.* Sections IV(A) and (G) also further the government's interests in protecting the Capitol grounds and the safety of those using the grounds. See *Clark, supra.* Section IV's time restrictions allow daily maintenance and cleanup on the lawn, but do not prevent an individual or group from voicing a cause. Because "a regulation need not be the least speech-restrictive means of advancing the Government's interests," § IV is a valid restriction. *Turner Broadcasting System, Inc v FCC,* 512 US —; 114 S Ct 2445, 2469; 129 L Ed 2d 497 (1994). Moreover, the fifteen-hour period between 8:00 A.M. and 11:00 P.M. and the additional time provided when both houses are in session outside these hours during which events and exhibits may be held do provide ample alternative channels of communication. Sections IV(A) and (G) do not impermissibly abridge plaintiff's free speech guarantees.

Plaintiff next contends that § IV(J) unconstitutionally restricts the number and size of structures that may be erected on the Capitol grounds. We disagree. Plaintiff asserts that § IV(J) was enacted specifically to prevent plaintiff's tent city and, therefore, amounts to viewpoint discrimination and that there is no justification for the specific size or numerical limitation.

Assuming that the regulation of non-shelter structures in the second paragraph of § IV(J) restricts expressive conduct,[10] it is a reasonable time,

---

Any display of artwork, including but not limited to paintings, sculptures, arts and crafts, and photographs; public service and educational presentations; and historical displays.

[10] We do not decide under what circumstances structures may constitute expressive activity. However, the state may ban structures that do not express ideas without implicating free speech guarantees.

place, and manner restriction. Section IV(J) applies equally to all organizations and is content-neutral; it restricts the size and number of structures without regard to the content of the expressive activity. *Madsen, supra* at 2523. Second, it serves a significant governmental interest, i.e. aesthetics and safety on the Capitol grounds. *Taxpayers for Vincent, supra* at 808-810; *Students Against Apartheid Coalition v O'Neil,* 838 F2d 735 (CA 4, 1988). The limitation in number and size of structures avoids visual clutter and blight. *O'Neil, supra.*

Plaintiff claims that the committee restricted the size of structures specifically to prevent it from erecting its tent city. On the contrary, the rules apply equally to all organizations and individuals. Plaintiff has not shown that the committee procedures were directed at its demonstration merely because the implementation of the new rules negatively affects plaintiff. Section IV(J) is a valid time, place, and manner restriction.

Affirmed.

WEAVER, P.J., did not participate.

## APPENDIX

PROCEDURES FOR THE USE OF THE PUBLIC AREA

THE MICHIGAN STATE CAPITOL

Approved by the Michigan Capitol Committee

March 25, 1992

[As amended by the Michigan Capitol Committee on April 1, 1993]

PUBLIC AND OTHER AREAS OF THE CAPITOL

The public areas of the Capitol are under the

jurisdiction of the Michigan Capitol Committee. All other areas of the Capitol are under the jurisdiction of either the Senate, the House of Representatives, or the Executive Branch.

The public areas of the Capitol include the rotunda and its galleries; the main corridors; the grand staircases; the ground floor entrances; the first floor exterior porches and staircases; all exterior building surfaces; and the Capitol's grounds, defined as the property on which the state Capitol building is situated, bordered on the north by Ottawa Street; on the east by Capitol Avenue; on the south by Allegan Street; and on the west by Walnut Street.

Information on and requests for use of the Capitol for an event or exhibit shall be provided by the agency holding jurisdiction over the space. Requests should be addressed to the appropriate office:

1. Requests about the public areas of the Capitol, which are under the jurisdiction of the Michigan Capitol Committee, must be addressed to the Facility Manager's Office, State Capitol, State of Michigan, Lansing, Michigan 48909.

2. Requests about the use of space under the jurisdiction of the Senate must be addressed to the Secretary of the Senate, P.O. Box 30036, Lansing, Michigan 48909-7536.

3. Requests about the use of space under the jurisdiction of the House of Representatives must be addressed to the Business Office, Michigan House of Representatives, P.O. Box 30014, Lansing, Michigan 48909-7514.

4. Requests about the use of space under the jurisdiction of the Executive Branch must be addressed to the Office of the Governor, State Capitol, Lansing, Michigan 48909.

The following procedures shall be followed in the

administration and operation of the public areas of the Michigan State Capitol. At no time will enforcement of these procedures be influenced or affected by age, sex, race, national origin, handicap, religion, or partisan politics.

I. DEFINITIONS:

The following words and terms, when used in this document, shall have the following meanings, unless the context clearly indicates otherwise.

A. EXHIBIT: Any display of artwork, including but not limited to paintings, sculptures, arts and crafts, and photographs; public service and educational presentations; and historical displays.

B. EVENT: Any performance, ceremony, presentation, meeting, rally or reception held in the public areas of the Capitol. A rally is defined as a gathering of people for the purpose of actively promoting a cause.

C. PARTISAN POLITICAL EVENT: An event held for the primary purpose of advancing or advocating the political candidacies of a particular party or group.

D. CAPITOL: The Michigan State Capitol. Unless otherwise specified, the use of the term "Capitol" will be taken to include the building and its grounds.

E. CAPITOL SECURITY: Regular state police officers, Capitol security officers, and civilian guards employed by the Michigan Capitol Committee.

II. CONDITIONS GOVERNING THE PUBLIC AREAS OF THE CAPITOL:

The following conditions apply to all public areas of the Capitol. For conditions specific to the interior or exterior public areas of the Capitol, see Sections III and IV below.

A. No public event or exhibit may discriminate on the basis of race, national origin, religion, sex, age, or handicap.

B. Public use of the Capitol shall not interfere with any legislative session or the conduct of public business by agencies of the State which normally occupy and use the Capitol, and shall not affect the safety and well-being of the individuals conducting the work of these agencies.

C. In case of fire, bomb threat, utility malfunction, structural failure or other unforeseen emergency or threat endangering public safety or health, the Executive Director of the Michigan Capitol Committee may delay or postpone any scheduled event until the emergency or threat is over.

D. Individuals or organizations are responsible for returning the areas used in conducting their events or exhibits to their original condition. Individuals or organizations are responsible for any vandalism, damage, breakage, loss or other destruction to the Capitol caused by that individual or organization. Costs will be assessed to individuals or organizations for damages incurred. The cost of the repair will include the costs for the services of specialists in relevant historical restoration skills as determined by the Executive Director of the Michigan Capitol Committee.

E. Individuals or organizations using the Capitol shall indemnify and hold harmless the State of Michigan, its departments, agents and employees, from and against any and all suits, damages, claims, or other liabilities due to personal injury or death, damage to or loss of property to the State or to others, or for any other injury or damage arising out of or resulting from the use of the Capitol.

F. Alcoholic beverages shall not be served or consumed in a public area of the Capitol or on the Capitol grounds.

G. Food and beverages may be served at a scheduled event or exhibit if all of the following criteria are met:

1. The applicant specifies in writing, prior to the event or exhibit, the type of food and beverages to be served and the desired service area.

2. Food and beverages shall be provided by a state licensed caterer; otherwise, individuals or organizations shall obtain a temporary food stand license from the Ingham County Health Department's Bureau of Environmental Health, as required by state law (Public Act 368 of 1978).

3. The applicant assumes responsibility for the preparation, service, and consumption of all food and beverages provided during the event or exhibit.

4. The food and beverage service will not cause physical damage to the Capitol.

H. Posting or affixing signs, announcements, or other documents on any exterior or interior wall, ceiling, floor, door, window or other surface of the public areas of the Capitol not designed for that purpose is prohibited. Stickers, labels, tape, or any other adhesive material that might leave a residue or otherwise damage interior or exterior surfaces of the Capitol, including porches, stairs, statuary, monuments, light wells, fences and trees is also prohibited. Likewise, tacks, nails, staples or other attachments may not be used. Display board space may be requested or arranged through the Facility Manager's Office.

I. No item or material with the potential to damage the Capitol may be used. All items or materials must be removed promptly after an exhibit or event.

J. No item may be leaned against exterior or interior walls, pillars, portraits, furnishings, staircases, or other feature of the Capitol.

K. The Capitol Facility Manager has limited equipment (for example, public address system, chairs, tables, podium, etc.) for use at exhibits or events. Arrangements may be made for the Facility Manager to provide such equipment upon payment of reasonable charges (see attached rate sheet), if available; otherwise it shall be provided by the individuals or organization sponsoring the

event or exhibit. If equipment is required, the Facility Manager's Office should be contacted to discuss what is available, how it is intended to be used, and to place a reservation. Requests for equipment should be made at least one week in advance of the event or exhibit. Individuals or organizations using such equipment will be responsible for any damage to or loss of that equipment.

L. Other than fees charged for the use of equipment, power, and labor to set up, operate, and remove equipment, no charges will be made to individuals or organizations for use of the Capitol's public space. See attached rate sheet.

M. Exhibits are allowed at the Capitol subject to the following conditions:

1. The State of Michigan is not responsible for damage to or loss or theft of exhibits during the period of their installation, display or removal. No special security can be provided for exhibits by Capitol security; all special security required for an exhibit must be provided by the exhibit's sponsor.

2. Exhibitors must bear all costs of assembling, mounting, displaying and removing exhibits and of cleaning up and restoring the exhibit space to its original condition under the supervision of the Facility Manager.

3. All displays must be free-standing. Exhibits may not hang from walls or ceilings or be affixed to doors, windows, railings or other building surfaces (except for standing on the floor). Exhibits on the Capitol's grounds may not hang or be affixed to trees, shrubbery or other plantings, statuary, monuments, fences, light fixtures, light wells, or the exterior surfaces of the building.

4. Exhibits must contain a disclaimer stating that the display is not owned, maintained, promoted, supported by or associated with the State of Michigan.

5. Exhibits may be scheduled for display for up to 14 calendar days. Exhibits on the Capitol grounds must be removed by the time and for the reasons set forth in Section IV(A).

6. Requests for exhibit space must include a clear layout, scale drawing or sketch of the proposed exhibit, preferably as it will be displayed. The dimensions of the space required should be indicated, as well as the manner in which the exhibit will be mounted or displayed.

N. No sound amplifying equipment may be used whose sound level interferes with any legislative session or the conduct of public business by agencies of the State which occupy or use the Capitol.

O. A person shall not remove state property from the Capitol or its grounds except as permitted in the normal course of business, unless the removal has been previously authorized in writing by the Executive Director of the Michigan Capitol Committee.

P. To enhance security and public safety, security officers may do the following: packages and briefcases suspected of concealing stolen items or contraband may be inspected. Items being brought into the State Capitol building may be inspected if suspected to be capable of destructive or disruptive use within the building.

Proper identification of all employees and any other visitor may be demanded at any time after normal working hours. If the facility is closed during an emergency, access may be denied for the duration of the emergency. Employees or other persons may be require[d] to sign a registration sheet after normal working hours or when the building is closed.

Q. A person who refuses to adhere to these conditions is subject, in addition to criminal penalties provided by law, to immediate removal from the Capitol building or grounds, or both, by the Executive Director of the Michigan Capitol Committee, Capitol security, the Facility Manager, or any other person designated by the Facility Manager. Nothing contained herein shall be construed as limiting prosecution under any existing or future law.

III. CONDITIONS GOVERNING THE PUBLIC AREAS OF THE CAPITOL; THE INTERIOR:

The following conditions governing the use of the public areas of the Capitol apply specifically to the use of the interior of the Capitol:

A. Hours of Operation: Visiting hours for the public are from 8:00 A.M. to 5:00 P.M. daily except Saturdays, Sundays, and holidays. When either house of the legislature or a legislative committee is in session prior to 8:00 A.M. or after 5:00 P.M., or on Saturday, Sunday or a holiday, the building shall be open to the public 30 minutes before commencement of the session and closed 30 minutes after adjournment of the Senate, House of Representatives, or legislative committee. The visiting hours on Saturday, Sunday and holidays shall be posted.

B. In case of fire, bomb threat, utility malfunction, structural failure or other unforeseen emergency or threat endangering public safety or health, the Executive Director of the Michigan Capitol Committee or Capitol security may lock the Capitol at any time and require the entrances be used from within only as a means of egress in case of emergency. A person shall not enter or attempt to enter through an entrance which is closed pursuant to these conditions until the emergency is over.

C. State law prohibits smoking in public buildings. Furthermore, the Capitol is a historic building with highly decorated walls, ceilings, and original works of art. Therefore, smoking or carrying lighted tobacco products is not permitted in any public area inside the Capitol, including the corridors, staircases, rotunda, restrooms and elevators.

D. Alcoholic beverages shall not be served or consumed in any public area of the Capitol.

E. An event or exhibit shall not obstruct entrances or block traffic flow through the building.

F. Moving the Capitol's furnishings, such as furniture, lighting, and paintings, by the organiz-

ers, conductors or participants at an event or exhibit is not permitted.

G. Tables, displays, chairs, or other items shall not be dragged or rolled on the marble floors of the corridors or the glass floor of the rotunda.

H. A partisan political event, as defined in Section I(C), is not allowed in the public areas inside the Capitol.

I. An individual or organization shall not solicit or sell any article or service in the public areas inside the Capitol, nor shall any exhibit or display be allowed for that purpose, including the display of business cards or promotional materials.

J. Due to the constricted space and crowded conditions which often prevail inside the Capitol, handcarried signs and signs on handsticks represent a serious safety hazard to visitors and occupants. They are not allowed in the public areas inside the Capitol.

K. Helium balloons are not allowed in the public spaces inside the Capitol because they are very difficult to retrieve.

L. Food and beverages shall not be served in the public areas inside the Capitol without the approval of the Executive Director of the Michigan Capitol Committee (see Section II-G). Food and beverages must be consumed in the area approved for an event or exhibit.

M. Except as may be required in the course of state business, animals are not allowed in the public areas inside the Capitol building. Guide dogs, however, may be used when necessary to assist handicapped persons in the Capitol building. The owner or person having the animal under his or her control shall be responsible.

N. Exhibits intended for the public areas inside the Capitol will be located in the ground floor rotunda. Requests will be scheduled on a first-come, first-served basis if the following criteria are met:

1. Exhibits do not obstruct entrances, interrupt traffic flow through the building, or disrupt legisla-

tive sessions or the normal conduct of public business in the building.

2. Mounted materials, whether items of display or information related to displays, are secured to tripods, display panels or other freestanding devices. Such panels, tripods, etc., when provided by the exhibitor, must meet the approval of the Facility Manager.

IV. CONDITIONS GOVERNING THE PUBLIC AREAS OF THE CAPITOL; THE EXTERIOR INCLUDING GROUNDS:

This portion of the public areas of the Capitol includes the exterior walls and surfaces of the building, the ground and first floor entrances, porches, and staircases, and the grounds. Public use of the Capitol grounds for scheduled events or exhibits is subject to the following:

A. In order to maintain the security, safety and aesthetic appearance of the Capitol and Capitol grounds, and to provide for regular maintenance, improvements or alterations, scheduled events or exhibits on the Capitol grounds shall occur between the hours of 8:00 A.M. to 11:00 P.M. on a daily basis, and shall at no time block any entrance or exit of the building, or impede free access to the building by its occupants or the public. When either house of the legislature or legislative committee is in session prior to 8:00 A.M. or after 11:00 P.M., the grounds shall be open 30 minutes before commencement of the session and closed 30 minutes after adjournment of the Senate, House of Representatives, or legislative committee.

B. Defacing or damaging the Capitol grounds, including trees, shrubbery, flowers, lawns, sidewalks, fences, lighting fixtures, light wells, fire hydrants, benches, statues, monuments, plaques, and such subterranean features as are necessary for the maintenance and operation of the Capitol (such as lawn sprinkler systems, sewer and water

mains, electrical conduit, etc.), or any other feature in any manner is not allowed. Likewise, defacing or damaging the exterior walls and surfaces of the building, including the entrances, porches and staircases, is not allowed.

C. Stepping or climbing upon statues, monuments, fences, lighting fixtures, light wells, trees, or parts of the Capitol building not intended for such purposes is not allowed.

D. Picketing and the distribution of literature shall not impede or interfere with State business or public access to and use of the Capitol. In order to inform individuals and organizations of the procedures for the use of public areas of the Capitol and grounds, it is recommended, but not required, that individuals and organizations desiring to distribute literature on the Capitol grounds advise the Capitol Facility Manager of the date and time of this activity. In order to assure the reasonable conduct of public business, unobstructed access to the Capitol for its occupants and the public, and to maintain the Capitol grounds, the Executive Committee (composed of the Chair and Vice-Chairs) of the Michigan Capitol Committee had been delegated the authority to designate specific areas of the grounds for picketing and the distribution of literature, which shall apply equally to all such activities. Individuals distributing literature shall remove all discarded items from the grounds at the conclusion of their activity.

E. Due to the presence of underground utility, electrical and drainage lines, signs or banners shall not be driven into the ground nor shall they be supported in or by any tree, monument or other structure affixed to the Capitol grounds. Signs (excluding disclaimer signs required under Section II(M)(4) or banners supported by freestanding devices may not be left unattended, i.e., an individual must be stationed within two feet of a freestanding sign or banner at all times to prevent damage to the grounds[,] injury to individuals, and for security reasons.

F. Use of the Capitol grounds by an individual or organization for an event or exhibit is authorized only if the event or exhibit has been scheduled with the Capitol Facility Manager in accordance with the procedures described herein.

G. Equipment or structures of any kind that are placed on the Capitol grounds in connection with an event or exhibit shall be entirely removed at the conclusion of the event or exhibit, or no later than the time set for closing of the grounds as set forth in Section IV(A).

H. Alcoholic beverages shall not be dispensed or consumed on the Capitol grounds.

I. Camping or sleeping overnight on the Capitol grounds is not allowed.

J. In order to maintain the security, safety and aesthetic appearance of the Capitol and Capitol grounds, and to provide for regular maintenance, improvements or alterations, structures, whether for shelter or for any other purpose, erected by an organization as part of a scheduled event or exhibit, shall be removed from the grounds by the time scheduled for the closing of the grounds as set forth in Section IV(A).

The size, number and location of structures erected for shelter shall be determined by the Executive Director of the Michigan Capitol Committee based on the physical conditions of the grounds and the expected size and nature of the event or exhibit. Such determination shall be stated in writing to the organization scheduling the event or exhibit.

Structures for a scheduled event or exhibit, for purposes other than shelter, shall be limited in number to one, in size to 3 feet × 3 feet × 3 feet, and shall not be capable of habitation. The Executive Committee of the Michigan Capitol Committee has been delegated the authority to designate specified areas of the Capitol grounds for location of structures of this kind, which shall apply equally to all such structures.

K. Vehicles are not allowed on the Capitol grounds, except in areas designated for vehicular

use, without permission of the Executive Director of the Michigan Capitol Committee.

L. Hunting and trapping are not allowed on the Capitol grounds.

### V. SCHEDULING EVENTS AND EXHIBITS:

Requests to schedule events or exhibits in the public areas of the Capitol or on the Capitol grounds shall be made to the Facility Manager's Office, Capitol Building, State of Michigan, Lansing, Michigan 48909.

A. Requests will be scheduled on a first-come, first-serve basis. Since the areas available for events and exhibits are limited and the demand is at times high, it is recommended, but not required, that requests be made at least one month in advance. In the case of exhibits, due to the length of time an exhibit may remain on display, additional lead time may be necessary to secure the desired space and date. These factors should be kept in mind when making requests.

B. Each request shall be in writing and shall contain the following information:

1. Name and description of sponsoring organization.

2. Name/address/telephone number(s) of contact person(s).

3. Name/address/telephone number(s) of back-up contact person(s).

4. Description of planned event or exhibit.

5. Date and hours requested for event or exhibit, and duration of an event or exhibit.

6. Area requested for use.

7. Number of anticipated attendees.

8. Equipment or services available through the Capitol Facility Manager can be used in connection with an event or exhibit on an "as available" basis, upon payment of reasonable fees and charges. A list of the equipment and the charges is

available upon request from the Capitol Facility Manager. See attached rate sheet.

C. All decisions by the Executive Director of the Michigan Capitol Committee required under these procedures shall be made as promptly as possible, but no later than two state business days after receiving the written request.

D. In order to schedule an event or exhibit, a sponsor is required to sign an acknowledgment that the sponsor has read, understood, and will abide by the procedures governing the use of the public areas of the Capitol; that the sponsor is responsible for damages incurred as a result of its event or exhibit; that the sponsor will either restore or pay to have restored the area used for its event or exhibit to the condition that existed prior to its use; and that it will indemnify and hold harmless the State of Michigan for any damage or loss the state incurs arising out of its use of the Capitol or the Capitol grounds. Any sponsor that fails to abide by the terms of the agreement will not be permitted to schedule a future event or exhibit until the outstanding obligations have been fully satisfied.

## VI. APPEALS

If a person or organization is aggrieved by a decision of the Executive Director, an appeal may be taken to the Executive Committee of the Michigan Capitol Committee within three state business days of that decision. The appeal shall be in writing, stating the basis therefor and the relief sought. The Executive Committee has been delegated the authority to review the decision and shall announce its decision as promptly as possible, but no later than six state business days after the members have received the appeal.